## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NORTHWEST MISSOURI HOLDINGS, INC.,<br><br>*et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 15 -10728 (BLS)<br><br>Jointly Administered |

## DECLARATION OF CHARLES T. LAKE II
## IN SUPPORT OF FIRST DAY PLEADINGS

I, Charles T. Lake II, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am over the age of 18 and am otherwise fully competent to make this declaration.  I am the Secretary & Treasurer of Northwest Missouri Holdings, Inc. ("**NWMHC**").  I am also the Treasurer of NWMHC's two, wholly-owned subsidiaries, The Oregon Farmers Mutual Telephone Company ("**TOFMTC**") and South Holt Cablevision ("**SHCTV**").  I am also the Treasurer of Oregon Farmers Mutual Long Distance Inc. ("**OFMLD**"), which is a wholly-owned subsidiary of TOFMTC (NWMHC, TOFMTC, SHCTV and OFLD are collectively the "**Debtors**" or the "**Companies**")[1].  In such capacity, I am knowledgeable to the extent set forth herein with the businesses, day-to-day operations, and financial affairs of the Debtor.

---

[1]    The Debtors in this case and the last four digits of their federal tax identification numbers are: Northwest Missouri Holdings, Inc. (1104); South Holt Cablevision, Inc. (2604); The Oregon Farmers Mutual Telephone Company (2780); Oregon Farmers Mutual Long Distance, Inc. (8678).  The location of the Debtors' corporate headquarters and the Debtors' address for service of process is: 118 East Nodaway Street, Oregon, MO  64473.

2.    I submit this Declaration (the "**Declaration**") in support of the voluntary petition for relief filed by the Debtors under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and the motions and applications for related relief filed contemporaneously herewith (collectively, the "**First Day Pleadings**").[2]

3.    I have reviewed the First Day Pleadings and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the business operations of the Companies so as to permit an effective transition into Chapter 11, preserve and maximize the value of the Debtors' estates, and, ultimately, achieve a successful reorganization.  I also believe that, absent immediate Chapter 11 relief and continued conduct in the ordinary course of business operations as set forth herein, and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of the estate.

4.    Except as otherwise indicated, the facts set forth in this Declaration are based upon my review of relevant documents, information provided to me or verified by other executives or employees, and my experience, knowledge and information concerning the operations, financial positions, and industry generally of the Debtors.    Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.  If called to testify, I would testify competently to the facts set forth herein based upon my personal knowledge, my review of relevant documents, and/or my opinion.  I am authorized to submit this declaration on behalf of the Debtors.

5.    Part I of this Declaration provides an overview of the business operations, capital structure, and financial standing of the Companies, as well as the circumstances surrounding the

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

Debtors' commencement of this Chapter 11 Case. Part II of this Declaration sets forth the facts relevant to the various First Day Pleadings in this case and the Debtors' business judgment in seeking such relief.

## I.    OVERVIEW OF DEBTORS' BUSINESSES

### A.    CAPITAL STRUCTURE AND FINANCIAL STANDING

#### i.    Debtors' Businesses

6.     NWMHC was incorporated in November of 2003. The current shareholders of NMWHC are Signal Equity Partners II, L.P. ("**SEPII**"), which owns 51% of NWMHC and American Broadband Communications, Inc. ("**ABB**"). On February 13, 2004, NWMCHC entered into two agreements for the acquisition of the stock of TOFMTC and SHCTV and their respective operations and subsidiaries: (i) a Stock Purchase Agreement among NWMHC, TOFMTC, Robert D. Williams, Randy D. Williams, and Katherine E. Williams, and (ii) a Stock and Asset Purchase Agreement among NWMHC, SHCTV, South Holt Communications, Inc., Robert D. Williams, Randy D. Williams, and Katherine E. Williams (collectively the "**Williams Family**") (the transaction described above is the "**Oregon Farmers Acquisition**").

7.     On or about September 23, 2004, the Oregon Farmers Acquisition closed in which NWMHC issued several promissory notes to the Williams Family in the aggregate amount of $1,000,000.00 (the "**Williams Notes**").

8.     NWMHC financed the Oregon Farmers Acquisition, in part, through a loan with the Rural Telephone Finance Cooperative, a South Dakota cooperative association (the "**RTFC**") in the principal amount of $7,388,889. A loan agreement, a secured promissory note and several other loan documents were entered into by NWMHC, TOFMTC, and SHCTV respectively in regards to the underlying debt (collectively, the "**RTFC Loan**"). In addition, a Subordination Agreement dated September 17, 2004, was entered into by NWMHC, RTFC, and Robert D.

Williams, in which the Williams Notes were subordinated to the RTFC Loan. Under the terms of the Subordination Agreement, payments on the Williams Notes were permissive and not mandatory until such time as the RTFC Loan was paid in full.

9.      Due to financial difficulties, on or about February 23, 2012, the RTFC, NWMHC, TOFMTC, SHCTV and OFMLD entered into a Forbearance Agreement and Third Amendment to Loan Agreement in which the RTFC agreed to forbear from collecting on the RTFC Loan in exchange for certain conditions. That agreement was extended by the parties through a series of amendments.

10.      On October 8, 2013, the RTFC informed NWMHC, TOFMTC, and SHCTV that the RTFC Loan was sold to Townes Tele-Communications, Inc. ("**Townes**"). At or near this time, Townes also informed NWMHC that it had acquired the Williams Notes. On October 10, 2013, Townes served a notice of default on NWMHC, TOFMTC, and SHCTV. On or about March 20, 2014, Townes purportedly further assigned the RTFC Loan to Townes Missouri, Inc., a Delaware corporation ("**Townes 1**").

11.      On March 21, 2014, Townes 1 filed a lawsuit against NWMHC, TOFMTC, SHCTV, and OFMLD seeking a judgment for the amount due under the RTFC Loan. The lawsuit was filed in the Circuit Court of Holt County, Missouri and is entitled Townes Missouri, Inc. vs. NWMHC Missouri Holding, Inc., TOFMTC Mutual Telephone Company, TOFMTC Long Distance, Inc., and SHCTV Cablevision, Inc., Case No. 14HO-CC00011 (the "**Holt County Litigation**"). On January 28, 2015, judgment was entered on a motion for summary judgment filed by Townes 1, in the principal amount of $5,192,696.16, plus interest.

12.      On or about February 25, 2015, the Williams Notes were purportedly assigned to Townes, which in turn, purportedly assigned the Williams Notes to Townes Missouri Two, Inc.,

a Delaware corporation ("**Townes 2**") and together with Townes and Townes 1 the ("**Townes Entities**").

13.     On or about May 1, 2014, Townes 2 filed a Petition in a lawsuit entitled Townes Missouri Two, Inc. v. American Broadband Capital, Inc., et al., Case No. 1416-CV10154, in the Circuit Court of Jackson County, Missouri, seeking judgment for the amount due under certain promissory notes issued to the Williams Family (the "**Jackson County Litigation**").  On March 9, 2015, Townes 2 filed a Second Amended Petition, naming NWMHC and seeking judgment for the amount due under the Williams Notes.

14.     While the RTFC perfected its security interest in September of 2004 and filed continuation statements in September of 2009, Townes or Townes 1 allowed the RTFC financing statements to lapse and did not file new financing statement until February 12, 2015 when Townes 1 filed new financing statements with respect to NWMHC, SHCTV and OFMLD.  The Debtors intend to file an adversary action to avoid those financing statements.  Neither RTFC nor any of the Townes Entities 1 filed any financing statements against TOFMTC.

15.     The Debtors primarily operate out of the State of Missouri.  The principal operating entity of the Debtors is TOFMTC, a single-exchange ILEC serving the northwest Missouri communities of Oregon, Forest City, New Point and Forbes. TOFMTC's franchised service area covers approximately 144 square miles and is located approximately 60 miles northwest of Kansas City, Missouri and 100 miles southeast of Omaha, Nebraska

16.     Internet services are provided to customers of the Debtors through NWMH and long distance services are provided through OFMLD. Video services are provided by SHCCTV in the Oregon and Forest City communities.

17.    As of February  2015, the Debtors served  2,229 revenue generating units including 858 telephone access lines, 564 broadband and 2 dial-up Internet customers, 512 long distance customers, and 293 video subscribers.  The number telephone access line and long distance customers have been decreasing due to competition from wireless telephone providers.

### ii.    Financial Condition

18.    The Debtor's current estimate of assets is $6.8 million and current estimate of liabilities is $7.5 million.  The Debtors have been negatively impacted by the actions of the Townes Entities.

### B.    EVENTS PRECIPITATING THE CHAPTER 11 FILINGS

19.    On March 6, 2015, Townes 1 filed a Motion for Issuance of Writ of Garnishment for Appointment of Receiver.   On March 18, 2015, the court in the Holt County Litigation granted the motion for writ of garnishment and scheduled a hearing for the motion for the appointment of a receiver for April 6, 2015.

20.    On or about March 20, 2015, Townes Missouri were issued writs of garnishments against certain banks located in Oregon, Missouri with respect to certain bank accounts held by NWMHC, OFMLD, and SHCTV.  Those garnishments were served on March 23, 2015, on the banks named in the garnishments and those funds were withdrawn from the bank accounts identified in the garnishments.  Specifically, the amounts withdrawn from the various bank accounts of the Debtors were: NWMH $119,135.21, SHC $17,150.50, OFMLD $1,988.45. These garnishment executions reduced these accounts to $0 and have for all intents and purposes closed the bank accounts of those Debtors.

21.    The Debtors believe that their only option to sustain viable operations and achieve an orderly sale is for the Debtors to initiate the Chapter 11 process, in order to continue to progress toward the Debtors' goal of marketing and selling the Companies and maximizing

recoveries to all creditors. The Debtors also believe that the appointment of a receiver in the Holt County Litigation would only serve to administratively deplete the estate while failing to maximize the value of the estate for the creditors and all constituents. Therefore, the Debtors' best alternative is to file these Chapter 11 proceedings.

II.     **REQUEST FOR EMERGENCY HEARINGS ON FIRST DAY PLEADINGS**

22.     Absent the Court granting the relief requested in the First Day Pleadings on an emergency basis, the Debtors will suffer immediate and irreparable harm.

23.     **Cash Management.** The Debtors request approval of their motion to (i) maintain its existing bank accounts, (ii) continue use of existing checks and business forms, (iii) obtain a limited waiver of Section 345(b) of the Bankruptcy Code, and (iv) continue intercompany transactions (the "**Cash Management Motion**").

24.     Prior to January 28, 2015 Debtors NWMH, SHC and OFMLD also maintained operating bank accounts. On January 28, 2015 judgment was entered in favor of Townes 1 against all Debtors in the amount of $5,192,696.18. On or about March 20, 2015, Townes 1 executed garnishments against these three bank accounts in the following amounts: NWMH $119,135.21, SHC $17,150.50, OFMLD $1,988.45. These garnishment executions reduced these accounts to $0 and have for all intents and purposes closed the accounts.

25.     The Debtors continue to maintain the following bank accounts (the "**Bank Accounts**")

| Company | Bank | Location | Account Number | Account Type |
|---|---|---|---|---|
| The Oregon Farmers Mutual Telephone Company | Home Exchange Bank | Oregon, MO | XX4847 | Checking |

| The Oregon Farmers Mutual Telephone Company | WSFS Bank | Wilmington, DE | XXXXX5021 | Checking |
|---|---|---|---|---|

26.     I submit that requiring Debtors to open new bank accounts at this early and critical stage of the Chapter 11 case would be expensive, impose administrative burdens, and cause needless disruption. As a result, the Debtors respectfully requests authority to continue the use of the Bank Accounts.

27.     **Employee Wages and Benefits Motion.** The Debtors request approval of their Emergency Motion for Entry of Order (i) authorizing payment of prepetition wages, salaries, and employee benefits, (ii) authorizing continuation of employee benefit plans and programs post-petition, and (iii) directing all banks to honor prepetition checks for payment of prepetition employee obligations (the "**Employee Wages and Benefits Motion**").

28.     These obligations and benefits in respect of the Debtors' employees may include, without limitation, (a) unpaid prepetition wages, salaries and reimbursable business expenses earned or incurred prior to the Petition Date (collectively, the "**Prepetition Employee Obligations**"); and (b) employee health and welfare benefit claims arising before the Petition Date including, without limitation, (i) medical, dental, vision and prescription drug coverage; (ii) basic life insurance; (iii) accidental death and dismemberment ("**AD&D**") insurance; (iv) short-term and long-term disability benefits; (v) a 401(k) savings plan, and (vi) paid time off ("**PTO**") (collectively, the "**Employee Benefits**").

A.     **Wages, Salaries, and Compensation**

29.     As of the Petition Date, the Debtors have approximately seven (7) employees (the "**Employees**"). Currently, the majority of the Employees are based in Oregon, Missouri. All of the Employees are either salaried employees or hourly. The weekly payroll obligations for the 7

employees are approximately $4,500.00. In the ordinary course of the Debtors' businesses, the Employees earn and are paid salaries and/or other compensation every week.

30.     As a general matter, one general account is used for paying the salaries and related employment benefits to hourly and salaried Employees every week on Thursdays. In addition, the Debtors are required by law to (i) match Social Security and Medicare taxes, (ii) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance and (iii) remit these payroll taxes to various taxing authorities (the "**Employer Payroll Taxes**"). The Debtors process payroll in house. The Debtors estimate that the Payrolls for earned salaries total approximately $1,200 plus applicable Employer Payroll Taxes per pay period for Salaried Employees and $3,300 plus applicable Employer Payroll Taxes per pay period for Hourly Employees. The Debtors request the authority to continue to pay regularly scheduled Payrolls, including Employer Payroll Taxes, in the ordinary course of business, including any prepetition amounts that may have accrued but not become payable as of the Petition Date.

31.     In the ordinary course of business, the Debtors also pay certain Payroll deductions manually, such as federal income taxes, Social Security and Medicare contributions, benefit plan insurance programs, and other similar programs (collectively, the "**Deductions**").

**B.      Reimbursement Obligations**

32.     Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed Employees for reasonable expenses incurred in performing their jobs, including, but not limited to, business-related travel expenses and cell phones (the "**Reimbursable Expenses**"). Reimbursable Expenses were incurred in the ordinary course of business with the expectation that such expenses would be reimbursed in accordance with past practice. It would

be inequitable and would cause harm to the morale of Employees to deny reimbursement of such expenses. Moreover, it is essential to the continued operation of the Debtors' businesses that the Debtors are permitted to continue to reimburse Employees for such business-related Reimbursable Expenses incurred in the ordinary course of the Debtors' businesses, whether incurred by an Employee pre-petition or post-petition. As of the Petition Date, the Debtors estimate that unpaid Reimbursable Expenses total approximately $0. Additional unpaid amounts that have yet to be submitted are likely to total approximately $0 based on prior months.

C.     **Employee Benefits**

33.     Five Employees are full-time employees scheduled to work more than thirty (30) hours per week. These employees are citizens or legal residents of the United States and, therefore, eligible for various standard employee health and welfare benefits, including, without limitation, the Employee Benefits (defined in paragraph 6 above).

34.     Medical, Dental, Vision and Prescription Drug Coverage: Employees are offered four (4) levels of voluntary medical plans by the Debtors through NTCA: Single A, Double A, Triple A or PPO (the "**Medical Plan**"). Medical Plan participants are also offered prescription drug coverage and vision coverage. Voluntary dental insurance is provided through Met Life. For the standard medical and vision benefits, the Debtors pay 85% of the Single A Plan (employer premiums are approximately $6,000 per month), and the Employee is responsible for paying the balance of the premium through payroll deductions. For the standard dental benefits, the Debtors pay premiums of approximately $250 per month, and the Employee is responsible for paying the balance of the premium through payroll deductions.

35.     Life, AD&D, Short-Term and Long-Term Disability Insurance: Employees are provided basic life and AD&D coverage and short-term and long-term disability benefits through

NTCA and Met Life.   The life insurance coverage provided to Employees is as follows: (a) basic life insurance of up to 2x annual wage for all salaried employees and 1x annual wage for hourly employees.  Basic short-term disability and long-term disability benefits are provided to all full time Employees who are temporarily unable to work due to injury or illness. The cost is paid in full by the Debtors.

36.    The 401(k) Savings Plan:  All Employees working 1,000 hours per year may enroll in the Debtors' 401(k) plan.  The plan is administered by NTCA.  Participating Employees may defer a portion of their annual compensation, subject to maximum limitations set by the Internal Revenue Service.  The Debtors match up to 4.5% for the 401(k) plan of the Employees.

37.    PTO:  All Employees receive PTO as part of their overall compensation.  On an annual basis, Employees accrue twenty (20) hours of PTO if the Employee has ten less than ½ of a year employment with the Debtors.  If the Employee has 1/2-1 year of employment with the Debtors, forty (40) hours of annual vacation is provided unless there is an employment agreement to the contrary.  Employees with one to four (1-4) years of employment with the Debtors accrue 120 hours of PTO, five to nine (5-9) years of employment earn 160 hours of PTO and employees with ten (10+) years of employment earn 200 hours of PTO, unless there is an employment agreement to the contrary.  Upon termination in the first half of the year, Employees are paid for up to half (½) of earned but unused PTO.  Upon termination in the second half of the year, Employees are paid for all remaining of earned but unused PTO. The Debtors anticipate that Employees will utilize PTO post-petition, including certain PTO that may have accrued before the Petition Date.  The Debtors seek authority (but not direction) to honor all earned PTO in the ordinary course consistent with the existing guidelines and policies described in this paragraph, regardless of whether it accrued during the pre or post-petition period.

38.    As of the Petition Date, the Debtors were obligated to pay certain premium contributions to, or provide benefits under the foregoing Employee Benefits programs, plans and policies.  The Debtors estimate the average monthly cost for Employee Benefits and related administrative fees is $7,900.  That total is calculated based upon the following summary of estimated monthly fees due by the Debtors: (i) Medical premiums ($7,100.00);  (ii) Dental/Life/STD/LTD premiums ($800.00); By this Motion, the Debtors seek authority to pay in the ordinary course of business all amounts owed for expenses and fees relating to Employee Benefits, including those incurred prior to the Petition Date.

39.    Given the importance of the continued efforts of the Employees to its contemplated restructuring, I believe that the authority (i) to pay the Prepetition Employee Obligations and Employee Benefits, and (ii) to continue the current Employee Benefits postpetition is in the best interests of the Debtors and their estates.

40.    **Insurance Motion**.  The Debtors request approval of their emergency motion for authorization to (i) continue prepetition insurance program and (ii) pay any prepetition premiums and related obligations (the "**Insurance Motion**").

41.    In the ordinary course of its business, the Debtors maintain a carefully designed insurance program (the "**Insurance Program**").  This program includes 9 insurance policies that were in effect as of the Petition Date, providing millions in dollars of coverage, including, but not limited to, policies covering general liability, umbrella coverage, workers' compensation, commercial property, auto, and equipment breakdown (collectively, the "**Policies**").  All of the Policies but one are provided by the same carrier (the "**Carriers**").  Attached hereto as **Exhibit A** and incorporated herein by reference is a comprehensive list of the Policies identified by the Debtors to date by type of coverage, Policy number, identity of Carriers, total premium for each

Policy, and other salient information. Debtor The Oregon Farmers Mutual Telephone Company is named as the primary insured under the Policies. The other 3 Debtors are also insured.

42.      The Debtors are responsible for approximately $20,000.00 per year in aggregate premiums and related fees to maintain the Insurance Program.      The continuation of these policies is both necessary and critical to the Debtors' ability to operate its businesses.

43.      The Debtors use Telecom Insurance Services Corp (the "Broker") to procure and coordinate insurance coverage for the Debtors. The Broker's services are critical to maintaining and renewing the various component policies within the Insurance Program. The Broker's fee is directly subsumed in the billings for premiums it provides to the Debtors.

44.      By obtaining the required insurance coverage thereunder, the Debtors have been able to realize substantial savings and efficiencies in the cost of its Insurance Program generally.

45.      Furthermore, in many cases, the coverage provided by the Policies is required by various regulations, laws and contracts that govern the Debtors' businesses under applicable non-bankruptcy law. Likewise, the U.S. Trustee Guidelines require the Debtors to maintain adequate insurance coverage. Such coverage could not be provided without continuation of the Insurance Program.

46.      As a result, I believe that the authority to make the payments required to continue their Insurance Program as requested in the Insurance Motion is in the best interests of the Debtors and their estates.

47.      **Utility Motion**.   The Debtors request approval of their motion for interim and final orders to (i) prohibit utility companies from discontinuing, altering or refusing service, (ii) deem utility companies adequately assured of future payment, and (iii) establish procedures for determining requests for additional adequate assurance (the "**Utilities Motion**").

48.     In connection with the operation of the Companies' businesses, the Debtors currently utilize telephone and internet, and other services such as electric and gas ("**Utility Services**") through certain accounts with utility companies (collectively, the "**Utility Companies**"), as set forth on **Exhibit A** to the Utilities Motion.  By their motion, the Debtors seek to implement procedures to provide its Utility Companies with adequate assurance of future payment.

49.     In the aggregate, the amounts of the average monthly billings for services provided by the Utility Companies total approximately $3,263.  The prepetition accounts that may have not yet been billed by the Utility Companies are likely minimal.

50.     The Debtors request that an amount equal to the greater of (i) one-half (1/2) of one month's utility payment (based on the average monthly payment for such utility services during the three (3) months prior to the Petition Date) or (ii) the deposit currently held by such utility, provides adequate assurance of payment and that no additional deposit (hereinafter referred to as an "**Adequate Assurance Deposit**"), security, or other assurance of payment should be required.

51.     As a result, I believe that the authority to pay the Utility Companies as requested in the Utilities Motion is in the best interests of the Debtors and their estates.

**Cash Collateral Motion**.  The Debtors request approval of its motion for interim and final orders to  authorizing the Debtors to use cash collateral (the "**Cash Collateral Motion**").

52.     In connection with the operation of the Debtors' businesses, the Debtors have been meeting their payroll obligations and vendor needs by having **TOFMTC** paying for all payroll and vendors for all Debtors.    Without access to its Cash Collateral, the Debtors will

have difficulty meeting their payroll obligations for Friday April 10, 2015. By their motion, the Debtors seek to gain access to their Cash Collateral to meet their ordinary business expenses.

53.     I believe that the authority to use Cash Collateral is in the best interests of the Debtors and their estates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April **6**, 2015.

_____
Charles T. Lake II

15